# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **ROBIN ZAHRAN** and **KAREN ZAHRAN**, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 13 C 8804 |
| ) | |
| **TRANSUNION CREDIT INFORMATION** ) | |
| **SERVICES CO., TRANS-UNION, EQUIFAX** ) | |
| **CREDIT INFORMATION SERVICES, INC.,** ) | |
| **EXPERIAN, INFORMATION SOLUTIONS,** ) | |
| **INC., BANK OF AMERICA (Successor in** ) | |
| **Interest to BNA and LaSalle Bank),** ) | |
| **CREDITOR INTERCHANGE LLC,** ) | |
| **DISCOVER FINANCIAL SERVICES, CITI** ) | |
| **BANK, BARCLAY BANK, REPUBLIC** ) | |
| **BANK OF ILLINOIS, P.N.C. BANK** ) | |
| **(Successor in Interest to National City Bank),** ) | |
| and **LASALLE BANK**, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Pro se plaintiff Robin Zahran ("Zahran") and his wife Karen, acting through counsel (collectively "Zahrans"), filed an extraordinarily prolix Complaint in the Circuit Court of Cook County against a host of defendants, advancing a shotgun fusillade of claims against those defendants. P.N.C. Bank ("PNC"), as successor in interest to National City Bank ("National"), was targeted with a purported federal claim as well as several purported claims under state law. It filed a timely notice of removal to bring the case to this District Court, where it was assigned at random to this Court's calendar.

Confronted with both answers and motions to dismiss from various defendants (the latter category including such a motion by PNC), Zahrans sought and were granted leave to file a First

Amended Complaint ("FAC"). PNC renewed its motion to dismiss, and a number of status and motion hearings ensued during which this Court made it clear that the purported federal claim against PNC was totally frivolous, so that the state law claims against PNC could well be remanded to their place of origin in the Circuit Court.[1]

But PNC's counsel has understandably urged that because he viewed the state law claims against his client as equally meritless for reasons fully covered in his already-filed motions and supporting memoranda, it would be a further waste of resources to send this case back to the state court to be presented afresh to a judge there who lacked entirely the background that this Court had already acquired in dealing with the case. That argument makes good sense, and this memorandum opinion and order will deal with PNC's motion for its dismissal in its entirety.[2]

First in order is the federal claim, which is sought to be grounded in the Fair Credit Reporting Act (the "Act," 15 U.S.C. §§ 1681ff.)[3]. Both the patent untenability of that claim and Zahran's continued efforts to pursue it in the face of this Court's repeated patient explanations as to its total inapplicability to PNC's conduct provide an unwitting probable clue as to why

---

[1] This is not the first time that the Zahrans have launched like litigation or that pro se plaintiff Zahran has conducted himself in the troublesome manner evidenced in this action -- see the October 4, 2007 memorandum opinion and order, (2007 WL 2962651) issued in this District Court's Case No. 01 C 8892 by this Court's then colleague of long standing, Honorable John Nordberg, attached to this opinion as its Ex. 1. For more on that subject, also see the attached Appendix following that Ex. 1.

[2] What follows in the text is far from fully reflective of the defects in the Zahrans' attempt to impose liability on PNC. PNC's thorough motions and its thorough memoranda in support of those motions have has set out a number of other meritorious Fed. R. Civ. P. ("Rule") 12(b)(6) contentions -- one, for example, is based on a persuasive limitations defense -- but this Court sees no need to prolong the discussion, for the matters dealt with here suffice to knock Zahrans out of the box against PNC.

[3] Any citations to the Act will take the form "Section --" omitting the prefatory "12 U.S.C."

Zahran -- who is plainly well able to afford to retain counsel to wage legal battles on his behalf -- chooses to proceed pro se instead. Both by his persistently combative stance and by his clear unwillingness to listen to what is said to him, instead simply waiting (or sometimes not waiting) for his opportunity to voice his own distorted views of what the law provides, he discloses a sort of ubermensch mentality: one that persists in ascribing a different meaning to the language of the Act than that prescribed by the Congress that enacted it and by the courts that have construed and applied it.

Thus in this instance PNC, as National's successor, had sued to recover something over $120,000 owed by Zahrans on advances in connection with an unsecured line of credit, but Zahran's resistance to that action had resulted in a settlement for the much smaller figure of $40,000 to be paid by the Zahrans in installments, with the parties' settlement agreement providing for mutual releases when that smaller figure was paid. PNC accurately reported to the credit reporting agencies that the "Account [was] paid in full for less than [the] full balance." As Zahrans would have it, that entirely truthful report somehow violated the Act -- an obviously nonsensical position.

So much, then, for Zahrans' purported federal claim. As for their asserted state law claims flowing from the same transaction and its mutually-agreed-upon settlement agreement -- one purporting to claim fraud in the inducement (FAC Count V), another claiming breach of contract (FAC Count VI), a third asserting a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2-101 (FAC Count VII), and the last claiming estoppel (FAC Count VIII) -- none even superficially survives consideration.

First, Zahrans' fraud-in-the-inducement charge is nothing more than a mere ipse dixit, wholly lacking in the particularity called for by Fed. R. Civ. P. 9(b). And that is not simply a

pleading defect, potentially curable by pleading over, for Zahrans have offered nothing better in the face of the challenge voiced by either PNC's original or its current motion.

Next, nothing in the parties' settlement agreement contains any promise or obligation that was even arguably breached by PNC's reporting to the credit reporting agencies. Moreover, the settlement agreement's integration clause forecloses any potential extracontractual breach of contract claim.[4]

Third, any attempted invocation of the Illinois statute barring "Consumer Fraud and Deceptive Business Practice" obviously carries no more heft than the already-described state common law fraud claim. So that count in the FAC fails as well.

Lastly, any potential promissory estoppel claim is barred by the provision in the parties' settlement agreement that Zahrans did not rely on any promises of PNC outside of that agreement when they executed it. So Zahrans have gone 0 for 4 on their putative state law claims against PNC.

**Conclusion**

Zahrans filed, and have stubbornly persisted in, meritless claims against PNC under both federal and state law. Hence PNC's motion for dismissal from the FAC is granted. But because a number of Zahrans' other targets in this action have also filed motions for dismissal (including still another that has just been tendered), and because it would seem to make little sense to splinter this case by creating the potential for piecemeal appeals (and the same may be said as to the potential for more than one sanctions award), this Court expressly refrains from considering the possibility of any Rule 54(b) determination pending the resolution of other dismissal

---

[4] PNC's truthful reports to the credit reporting agencies produced credit reports from those agencies stating accurately that after Zahrans had made their final installment payment in October 2011 the balance of the PNC account was "$0," that the debt had been "legally paid in full for less than the full balance" and that the account was "paid in full."

- 4 -

motions. That of course deprives the result here of finality as a legal matter at the present time, but this Court sees no consequent prejudice to either party.

  /s/ Milton I. Shadur
  Milton I. Shadur
  Senior United States District Judge

Date: April 22, 2014

2007 WL 2962651
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Robin ZAHRAN and Karen Zahran, Plaintiffs,
v.
FIRST UNION BANK, Interbay Funding, LLC and the Officers and Directors of Interbay Funding, and M & T Mortgage Corporation, and Ira Nevel, a private attorney, Defendants.

No. 01 C 8922.  |  Oct. 4, 2007.

**Attorneys and Law Firms**

Robin Zahran, Oakbrook, IL, pro se.

Karen Zahran, Oakbrook, IL, pro se.

James V. Noonan, Mitchell Aaron Lieberman, Noonan & Lieberman, Michael J. Weik, Smith Weik & Wutscher, Ltd., Chicago, IL, Christine Marie Andrie, Stephens & Schrauth, Winnetka, IL, for Defendants.

Opinion

### MEMORANDUM OPINION AND ORDER

JOHN A. NORDBERG, Senior United States District Court Judge.

*1 Plaintiffs Robin and Karen Zahran, proceeding *pro se*, have asserted numerous state and federal claims arising out of a $350,000 mortgage they obtained in 1986 on their Oak Brook home. Defendants have complained throughout this lawsuit that these claims lack merit and have suggested that plaintiffs are only trying to force them to settle by turning the litigation process into a never-ending headache. After a lengthy period dealing with pre-discovery motions and after a year of discovery, defendants eventually concluded that they could not develop the facts necessary to defend against these claims. They allege that plaintiffs have violated court orders and played games in discovery. Before the Court is defendants' motion for sanctions. They ask that we dismiss all of plaintiffs' claims with prejudice. Plaintiffs oppose the motion, arguing that they have done anything wrong and that, in fact, defendants are the ones who have made false statements and stonewalled discovery.

### I. Background.

The following facts provide an overview of what has gone on so far in this case. Before moving to dismiss the complaint, defendants filed a motion to strike under Rule 8 because they believed that the complaint was a "pleading labyrinth"-confusing, rambling, repetitive, and poorly organized. Although we largely agreed with this assessment, we denied the motion, in part out of deference to plaintiffs' *pro se* status, and encouraged defendants to file a dispositive motion instead. Heeding our suggestion, defendants filed a motion to dismiss pursuant to Rule 12(b)(6) and for summary judgment, seeking dismissal of all 17 counts. Even then, defendants still complained that they had to spend an inordinate amount of time "deciphering" the complaint. After analyzing the lengthy briefs, consisting of a 40-page opening brief, a 63-page response, and a 33-page reply, we granted the motion in part and denied it in part, dismissing 9 of the 17 counts. In doing so, we were sympathetic to the defendants' objection about the unwieldy complaint (it was 33 pages with 96 pages of exhibits) but concluded that the liberal notice pleading rules and plaintiffs' *pro se* status cautioned against premature dismissal. We again decided that it was better to keep the case moving because the claims could be sorted out and pinned down during the discovery process at which point the defendants could file (if appropriate) a motion for summary judgment.

After peripheral issues were resolved, discovery began in earnest in January 2006. In December, the defendants essentially concluded that discovery had been a total failure and filed their motion for sanctions pursuant to Rule 37(b)(2) and (d). After receiving several extensions of time, plaintiffs filed a lengthy response brief along with a stack of 44 exhibits.

The disputes raised in the briefs center almost exclusively on the interactions between two men-plaintiff Robin Zahran, who has been making the litigation decisions for his wife, and attorney Michael Weik, who is the attorney handling discovery for defendants. (For convenience, we will sometimes refer to Zahran and Weik as surrogate terms for plaintiffs and defendants.) Each man accuses the other of egregious conduct-lying, name-calling, and manipulation. Not only do the two men disagree on who is at fault generally, they also disagree on numerous mundane facts about what has gone on in discovery.

Exhibit 1

*2 Although defendants complain about Zahran's conduct throughout the case, their motion initially focuses on Zahran's failure to answer interrogatories and document requests. To recap the facts relevant to this issue, plaintiffs were ordered to respond to both requests by April 30, 2006. Although Zahran responded to the document request by that date, he did not serve his interrogatories until early June. Both responses were patently inadequate, according to Weik, and contained only boilerplate objections. Weik requested a Rule 37 conference. After some wrangling over a suitable date and whether the meeting would be recorded, itself one of the many disputes in this case, the parties met for two days-on July 6th and 11th-with a court reporter present.[1] At the conference, Zahran and Weik appeared to resolve a few of their discovery disputes and, with regard to many others, Zahran stated that he needed to do more research and would either make a more specific objection within 10 days or would submit an updated answer within 21 days. But Zahran failed to respond as promised. And so, on August 29th, Weik filed a motion to compel. After briefing, including *two* response briefs filed by Zahran, Judge Mason granted (with a few minor exceptions) the motion in a minute order dated October 17th. The 10/17 Order is a focal point of defendants' present motion because defendants complain that now, even after being directly ordered to respond to the outstanding discovery requests, Zahran has still not complied.

Each side has submitted documents and affidavits, and neither side has requested an evidentiary hearing. We therefore must attempt to resolve these disputes from the materials submitted. Given the significance of the sanction being requested, we have reviewed not only the materials submitted by the parties, but have also looked at the case from a broader perspective by reviewing the docket sheet and the filings made by both parties since the beginning of this litigation.

## II. Plaintiffs' *Pro Se* Status.

Before turning to the merits, we must address upfront one issue that lurks in the background: whether plaintiffs' behavior is attributable to, or should be excused as a result of, their *pro se* status. Defendants argue that plaintiffs are sophisticated litigators who have strategically invoked their *pro se* status to avoid rules and obligations. Based on the three reasons set forth below, we agree that plaintiffs should not receive any special deference.

*First,* Zahran is a frequent litigator. According to public records obtained by defendants, Zahran and his wife have been a party in 30 federal cases, 20 cases in the Circuit Court of Cook County, and 25 in DuPage County. (Defs. Reply., Exs. 1 & 2.) Most of these lawsuits, insofar as we can tell, were filed by Zahran and litigated *pro se,* although in a few instances he chose to hire a lawyer. (Zahran did not file an *in forma pauperis* application in this case seeking appointment of counsel.) Statistically, the odds that Zahran would be the unlucky victim in 75 litigation disputes are extremely low, which raises a concern about whether this lawsuit was filed in good faith. For purposes of this motion, however, we need not rely on any such conclusion, but we can fairly assume from Zahran's extensive experience that he knows how the discovery process works and is aware of the applicable rules, procedures, deadlines, and discovery practices. In fact, this conclusion was drawn back in 1994 by Judge Zagel who then observed that Zahran and his wife "litigate often" and show "a reasonable degree of legal sophistication." *Zahran v. Al Baraka Bankcorp.,* 1994 WL 323075, *1 (June 28, 1994) (ordering Zahran to pay $1,500 in sanctions).

*3 *Second,* Zahran has been warned about this type of conduct and has been sanctioned by several courts. In *Zahran v. Frankenmuth Mut. Ins.,* 175 F.3d 1022, 1998 WL 975094 (7th Cir.1998), the Seventh Circuit ordered the Zahrans to submit a list of all the times they had been sanctioned by district courts in this circuit. As of that date, *i.e.* 1998, the Zahrans had been sanctioned in four cases and had failed to pay the fines in three of the four cases and had paid the other one four years later. *Id.* at *1. In *Predentin v. Zahran,* 530 N.W.2d 69, 1995 WL 17687 (Wisc.App.Ct.1995), the Wisconsin Appellate Court struck Zahran's opening appellate brief, thus ending his appeal, because it concluded that his excuse for filing his brief late (*i.e.* that his photocopier broke down) was not credible given that he had already received two extensions of time. The Court recognized that Zahran was *pro se* but still felt that sanctions were appropriate because he had shown a "casual disregard for the rules of appellate process." *Id* at *1, Judge Mason reached a similar conclusion here. After supervising discovery for several months, during which time he gave Zahran leeway based on his *pro se* status, Judge Mason eventually concluded that this deference was no longer justified due to Zahran's repeated rule violations. Judge Mason specifically warned Zahran, in a July 2006 minute order, that he was "on notice that this Court will not tolerate any future failure to comply with discovery deadlines, with Federal Rules of Civil Procedure or with this Court's standing orders and case management procedures."

*Third,* Zahran has frequently accused his opponents of violating court rules. In several instances, he has cited to rules that the typical *pro se* filer would not be aware of. For example, Zahran has accused defendants of violating page-limitation rules, even arguing that Weik skirted them by using single-line spacing and footnotes. *See* Docket # 115 at p. 2. (This accusation, like many others, is ironic given that Zahran has violated these rules more often than defendants.) Zahran also objected that the requests to admit by defendants were improper because the person signing them was not acting in the proper capacity for the corporation. In the Rule 37 conference, which was being transcribed by a court reporter, Zahran objected that Weik failed to put a request in writing. *See* Tr. at 45 ("MR. ZAHRAN: Your new request [is made] now verbally, the rule says it has to be in writing."). These are just a few examples of Zahran's many one-sided invocation of the rules. It would be unfair if he could accuse his opponents of violating court rules but then be allowed to "cry uncle" by invoking his *pro se* status when his opponents complain about the same thing.

### III. The Merits.

In reviewing a motion for sanctions under Rule 37, we may issue a range of sanctions including dismissal with prejudice. Dismissal may be ordered, without first imposing a less severe sanction, if we find that there has been a "pattern of noncompliance with the court's discovery orders." *Newman v. Metropolitan Pier & Exposition Authority,* 962 F.2d 589, 591 (7th Cir.1992) (affirming dismissal with prejudice under Rule 37 for failure to cooperate in pretrial discovery: "The cases in this circuit [ ] do not set up a row of artificial hoops labeled 'bad faith' and 'egregious conduct' and 'no less severe alternative' through which a judge must jump in order to be permitted by us appellate judges to dismiss a suit."). We also have inherent authority to sanction a party who acts "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.,* 502 U.S. 32, 45-46, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991). Dismissal with prejudice is also one option under this source of authority. *Id.* The parties do not disagree about these legal standards. In fact, Zahran in his response brief has invited us to review the "full record" and stated that we should impose sanction if we find that he has engaged in-to quote from his brief-"[r]epetitive obstructive tactics, capricious arguments and statements designed to stymie discovery." (Resp. at 29.)

*4 We begin by summarizing the arguments. As noted above, defendants focus both on Zahran's failure to comply with Judge Mason's 10/17 Order, which required him to supplement discovery answers, and on his overall approach to discovery, Zahran responds with several global arguments: (i) he alleges that defendants are unreasonably seeking documents that they know don't exist or were disposed of long ago; (ii) he complains that defendants refused to participate in settlement conferences; and (iii) he alleges that defendants have not entered into a confidentiality agreement. Zahran also defends his discovery responses on an item-by-item basis.

After reviewing the submitted materials, it is clear that the parties' disagreement runs deep and that there are so many factual disputes that we cannot resolve every single one of them here. For some of them, the only evidence we have to rely on is Zahran's word versus Weik's word as set forth in dueling affidavits. Another impediment to our review is Zahran's brief. Like his complaint, it is disorganized, repetitive, and lengthy. (It is also, as described below, misleading and evasive.) Despite these problems, after a careful but unnecessarily time-consuming review of the record, we have been able to resolve a sufficient number of these disputes with a high degree of confidence. Of particular help has been the Rule 37 transcript where we have indisputable proof of what each man said and which we have been able to use as a way to test the claims they now make in their briefs.

From this review, a clear and one-sided picture has emerged. Zahran has violated court orders, misrepresented the factual record, and engaged in numerous evasive tactics that have needlessly prolonged these proceedings. We describe some examples below.

*First,* as one of many examples of Zahran's "bad faith and deception," defendants allege that Zahran failed to attach documents to the supplementary interrogatory answers he gave in response to Judge Mason's 10/17 Order. Zahran stated in several places that he was attaching documents as part of his interrogatory answers. (Defs. Mot. Ex. D at p. 1, 11.) But, according to Weik, no documents were attached. Proceeding on the reasonable assumption that this omission could have been an innocent mistake, Weik contacted Zahran several times in November, by email and letter, asking that he Fed Ex Weik the missing exhibits. *See* Defs. Reply Ex. 5. Zahran didn't respond, but he did ask his secretary to tell Weik that he would give him the documents at the document production set to begin in Zahran's office on December 5th. According to Weik, when he showed up on the 5th, Zahran did not have the documents set aside for him. (Defs. Mot ¶ 14.)

Before addressing Zahran's counter-explanation, we note that this dispute is not trivial. One of defendants' long-running complaints has been that Zahran has never given specific answers to interrogatories. In the 10/17 Order, Judge Mason agreed with defendants and explicitly told Zahran that, if he wanted to answer an interrogatory by relying on a document, he "must" refer to those documents by Bates numbers.

*5 Now to Zahran's response brief. Zahran begins with the blanket assertion that *all* of the allegations are "simply false." (Resp. at 15.) Why? Because, he explains, the exhibits "were *produced* to Mr. Weik when he came to Zahran's office as these documents were voluminous." (*Id.;* emphasis added.) Zahran further asserts that he has proof to back up this claim in the form of his own affidavit and the affidavits of his wife and secretary. Zahran believes that this proof is so strong that Weik should be sanctioned for even suggesting that Zahran did not produce the documents.

This explanation, like many others given by Zahran, falls apart upon modest scrutiny. The initial issue, we should not forget, was whether Zahran initially *attached* the documents. Zahran doesn't respond to this allegation in his brief except, of course, in his blanket denial of any wrongdoing. Nor did he object in November when Weik brought up the issue and requested that copies be sent by Fed Ex. So, Zahran has implicitly conceded that he did not attach the documents with his original filing on November 14th. Instead, he changed the subject, arguing that he *produced* the documents. But even on this question, the evidence favors Weik. Although Zahran claims that he has affidavits to show that he produced the documents in person, we could find no such support in the cited documents. As for Zahran's own affidavit, it confusingly states (¶ 4): "That I, Robin Zahran made my office accessible for 4 days starting December 4, 2006 and I extended the time for an additional one week pursuant to his request and Attorney Weik *never showed up* and all the documents were available for his inspection and copying." (Emphasis added.) Defendants interpret this statement as claiming that Weik never showed up at all, which of course would mean that Zahran could not have "given [the documents] to Weik" as he claims in his response that he did. Although we interpret the statement the same way as defendants, which would mean that his affidavit contains a false statement, we will give him the benefit of the doubt and assume that he was confused or perhaps meant to say only that Weik did not show up later in December. Finding no support in his own affidavit, we then turned to the affidavits of his wife and secretary.[2] Contrary to Zahran's claim in his brief, these affidavits do not state that he gave to Weik the specific documents that were supposed to be attached to his supplemental interrogatories. We thus find that Zahran did not produce the documents in person, a conclusion that is bolstered by the fact that Zahran attached a copy of his interrogatory answers to his response brief but did not include, as he easily could have done, a copy of the documents he supposedly produced in person. *See* Pls. Ex. 12 (attaching a copy of the discovery response still without exhibits). To summarize, after many months and much hassle, Zahran still has not provided the documents. Of course, we should not forget in all this discussion about whether Zahran first failed to *attach* the documents or about whether he later failed to *produce* them is that he was specifically told in the 10/17 Order to refer to the documents *by their Bates numbers*. It is undisputed that he did not comply with this straightforward order.

*6 *Second,* one of Zahran's general arguments in his response brief is that Weik unreasonably has been asking him to produce documents he doesn't have or discarded long ago. *See, e.g., Zahran Aff.* at ¶ 3 (alleging that Weik has "constantly asked for documents that do not exist in my possession such as tax returns"). Weik denies the claim. In assessing this dispute, we find that the Rule 37 transcript provides clear evidence in support of Weik. It shows that Weik was merely seeking to *either* get the documents at issue *or confirm* that Zahran did not have them. At page 14 of the transcript, for example, Weik told Zahran: "You may have already produced everything that you would otherwise produce. I'm just asking. If that's the case, let me know. If not, I'm asking you to produce any other records." Yet, Zahran would not give a clear answer, Zahran's attempt now in his response brief to suggest that Weik was being unreasonable is itself disingenuous and misleading to this Court.

Consider, in this regard, the issue of tax returns. In written discovery, Weik asked Zahran for returns going back to 1994, Zahran responded with boilerplate objections, stating only that the request was irrelevant and burdensome, (Pls.Ex. 5.) At the Rule 37 conference, Weik explained why he thought the returns were relevant-to show how plaintiffs scheduled the loan, what interest deductions they may have taken, and to shed light on damages. (Tr. at 29.) Zahran still objected but said that he would give Weik Schedule B of Zahran's tax returns going back to year 2000. After the conference, Weik waited for the Schedule B returns back to 2000 that Zahran said he would produce. He did not. Weik filed his motion to compel in which he argued (among other things) that Zahran failed to produce the promised

returns and argued that defendants had a right to the full returns back to 1994, See Mot. ¶ 17(b). Judge Mason agreed with defendants and ordered Zahran to produce all the tax returns as well as many other documents. Zahran still didn't produce them. Defendants have raised this issue again in the current sanctions motion. After all that effort, Zahran now explains that the tax returns back to 1994 all "were discarded" and accuses Weik of being unreasonable in seeking them, again asking for sanctions. (Resp. at 11.) But the record is clear. Zahran acted unreasonably and then later misleadingly described what had happened to cover up this fact.

*Third*, another general defense raised by Zahran is to accuse Weik of failing to participate in settlement discussions. (He again asks for sanctions.) This issue is, first of all, irrelevant to and distracting from the central question of whether Zahran has complied with the outstanding discovery requests, Zahran's claim is also undermined by the Rule 37 transcript. During this conference, Weik stated several times that he was willing to discuss settlement, as the following exchanges shows:

*7 MR. ZAHRAN: [ ] Judge Nordberg said, Go and have a settlement conference. And my understanding is you do not want to settle, correct?

MR. WEIK: *If you want to have a conference regarding settlement, I will have it.* That is certainly is not something that you put on the record for any number of reasons, including the fact that settlement negotiations are privileged and confidential. So I would be happy to-

MR. ZAHRAN: *No. I'm not interested in that.* That's not what I said.

(Tr. at 193-94; emphasis added). The fact that Zahran, in his response brief, raises this issue and unfairly accuses Weik of not cooperating despite these clear statements to the contrary again leads us to conclude that Zahran is misrepresenting the factual record.

*Fourth*, a similarly distracting and misleading argument is Zahran's claim that defendants would not enter into a confidentiality agreement. Here again, the Rule 37 transcript comes to the rescue. It shows that Weik stated, subject to a few minor qualifications, that his clients would be willing to enter into a confidentiality agreement. *See* Tr. at 20. There is no evidence that Zahran followed up on this issue after the conference, as it would have been his responsibility to do as the party seeking the agreement, nor is there any evidence that Weik ever changed his position or refused to enter into an agreement presented to him.

The misleading factual claims in Zahran's response brief are not isolated occurrences. He has made false statements in other court-filed documents. For example, in his (second) response brief to defendants' motion to compel, Zahran made this factual claim about whether his wife was present at the two days of the Rule 37 conference:

> Robin Zahran met with Mr. Weik on July 6th and 11th of 2006, as Karen Zahran was not available since she had planned her summer vacation earlier and could not change timing. Attorney Weik's statements that Mrs. Zahran "agreed" is again erroneous.

(Docket # 117 at p. 3.) But this claim is easily proven as false. Mrs. Zahran, although not present the second day, was indisputably present the first day as is evident from the transcript. More importantly, at the end of the first day, she stated on the record that her husband could speak on her behalf in the second day of the conference. *See* Tr. at 134 (Mrs. Zahran: "I will allow him to speak on my behalf."). Thus, Zahran's argument-that Weik falsely stated that Mrs. Zahran "agreed" to things at the Rule 37 conference-is itself a false statement. It is one that is either intentionally misleading or was made with an extreme lack of care and thus amounts to the same thing.

We have summarized only some of the disputes between the parties. There are many others, but we will not spend further time going through them because, after a careful review of the entire record, we have come to a broader conclusion that Zahran's word cannot be trusted as he has repeatedly misrepresented the record and wrongfully accused Weik of wrongdoing when Weik has done nothing wrong. We no longer have confidence that what Zahran is saying is true and this lack of confidence undermines the integrity and further viability of these legal proceedings.

*8 But misleading and false statements are not the only problem. Defendants also complain about Zahran's disregard for court rules and procedures; his rude and unprofessional comments; and his general lack of preparation for and knowledge of his case. After reviewing the materials submitted to us, we again agree with the defendants' assessment. Some of these problems have already been discussed above, but we set forth a few more below.

**Ignoring court rules.** Zahran has repeatedly and unjustifiably ignored court rules and deadlines and has typically tried to explain away these failure by coming up with one excuse after another. Judge Mason described various violations of court rules. *See* 7/24/06 Order (listing problems).

One example is Zahran's responses to the interrogatories now at issue. In his initial response, he gave vague objections. In the Rule 37 conference he asserted different objections. After that conference, he did some research and raised a new argument, claiming for the first time that defendants' interrogatories exceeded the allowable number. (Docket # 117 at 3-4.) In granting the motion to compel, Judge Mason implicitly rejected this argument. (10/17/06 Order.) But now in his response brief, at page 19, he again raises the argument about the number of interrogatories and misleadingly suggests to this Court that Judge Mason agreed with him on this point. *See* Resp. at 19 (stating that the amount of defendants' interrogatories is not what "Judge Mason or the federal rules intended to occur"). The end result is that Zahran has parceled out these objections over a six-month period causing unnecessary delay and expense.

**Making unprofessional comments.** Zahran claims in his response brief (and in his affidavit) that he has *never* made any personal attacks against opposing counsel. But the Rule 37 transcript suggests otherwise. Throughout the two-day conference, Zahran made snide comments and personal remarks to Weik. Zahran was rude, frequently interrupting Weik to cut off legitimate questions and then ordering him to "move on" to another topic. For example, in the middle of a seemingly straightforward discussion of discovery issues, Zahran blurted out to Weik: "You should be sued for debt collection. Honest to God, I should really do that." At another point, Zahran stated: "I'm very disappointed in you, Mr. Weik. I thought you were a much better man; I really did." (Tr. at 120.) The transcript is filled with these kinds of statements. *See, e.g.,* at 77 ("How in the world could you lie?"); at 67 ("You play a game, and you are a master at it."); at 80 ("Be honest for a change, okay?"); at 98 ("And you agree, don't you not, Mr. Weik, that [these] interrogatories are frivolous and made for harassment?"); at 102 ("I'm not intelligent like you. I don't have it memorized."); at 116 ("instead of you screwing around, admit it. It would be much easier. Then you pay the thousand bucks and get them out"); at 131 ("You're silly. Are you done?"); at 184 ("You have been doing nothing but harassing me."). He also made the following unnecessary and unsolicited comment about one individual defendant, Ira Nevel: "He [Nevel] committed perjury, okay. He's the lawyer now, and he's the one who made the racial remarks. The guy should go back to where he came from, Palestine." (Tr. at 96-97.) We recognize that Zahran has alleged that Nevel earlier made a racist comment to Zahran, but this still does not justify this unprovoked comment to Weik in the middle of the Rule 37 conference. Even though Zahran constantly badgered Weik with these comments, Weik ignored them and continued to focus on the specific discovery disputes at hand.[3]

*9 **Failing to Prepare.** Zahran also has been unprepared and disorganized throughout the discovery process, further wasting time and driving up costs. Zahran knew before the Rule 37 conference that Weik would be asking about Zahran's discovery objections. Yet, at the conference, it was clear that Zahran had not given any thought to the issues. He gave inconsistent answers, and tried to shift the discussion to irrelevant side issues and then stated that he needed to do more research. *See, e.g.* Tr. at 55: "I will read the law again and see if you are entitled for me to go and spend my time to figure that amount." Zahran also didn't have copies of the relevant documents and didn't know basic facts about his own case. *See, e.g.,* Tr. at 138. For instance, when asked which term of the mortgage he believed the defendants violated, he gave vague and inconsistent answers, first stating that defendants violated "every term" on the mortgage, then asserting that he would not speculate about the question. (Tr. at 86-88.) When asked what his counts were against defendant Nevel, he said he didn't know. (Tr. at 95.) When asked about his count against defendant Bayview, he also said that he did not know what it was and asked Weik: "What is my count against Bayview?" (Tr. at 112.) When Weik told him that he had only one count, he was surprised and said: "That's it." (*Id.*) On important issues such as the rate of interest, he responded: "The amount is not calculated as of yet. We'll supply it to you when I calculate it." (Tr. at 150.) As defendants persuasively point out, the fact that Zahran didn't know the answer to defendants' interrogatories or that he had to wait to see defendants' documents before answering them raises suspicion, especially when he was the president of a mortgage company and owns or has owned a number of properties in Illinois, Wisconsin, and Georgia. In this regard, we agree with the following assessment set forth on page 14 of defendants' reply brief:

> [T]he idea that [plaintiffs] can allege that Defendants breached the terms of the note and mortgage

or violated a statute without identifying the provision breached or sections violated is not credible. The notion that they can allege that they discovered "accounting and bookkeeping irregularities," illegal charges" and misapplied payments" without being able to describe those specific irregularities, charges and misapplied payments they claim they discovered does not make sense. The concept that they can allege that they discovered the principal balance was wrong but cannot describe what it should be or how they calculated the correct balance is illogical,

Zahran's lack of preparation for and knowledge about his case raise grave doubts that he could ever prosecute this case to a successful conclusion. His approach suggests that he does not have a coherent larger strategy but is just "winging it" from one moment to the next. Perhaps he is hoping for a settlement as defendants suggest, a view that would explain why he has spent so much time in his response brief focusing on the defendants' alleged failure to participate in settlement discussions.

*10 Another issue that relates both to violation of court orders and to the lack of preparation is Zahran's habit of filing briefs late. As with many of the issues we have discussed, this one would not be as significant if it occurred only on isolated occasions. A simple review of the docket sheet provides clear evidence on this point. To provide one illustration of Zahran's casual regard for briefing deadlines, we will recount the history of the filing of his response brief on the current sanctions motion. The details are again tedious but necessary to show a pattern that only emerges in clear focus when one reviews the record from a wider perspective.

To recap, defendants' sanction motion was originally filed by defendants on December 15, 2006, and noticed up before Judge Mason on December 21st-six days later. (It is worth remembering, as we discuss this issue, that Zahran received a copy of this motion by December 18th.) On December 19th, Judge Mason issued a minute order directing defendants to re-notice the motion before this Court because it was a dispositive motion. That same day, complying with Judge Mason's request, defendants re-noticed the motion before this Court for next day, December 20th. Zahran did not show up on the 20th but this Court set a briefing schedule directing him to file a response brief by January 3rd and then set a status date for January 4th.

On January 3rd, Zahran faxed to opposing counsel a motion for extension of time to file his response brief. He presented the motion the next day and gave numerous reasons for why he could not meet the deadline. The first was to complain that Weik, when he noticed up the motion before this Court on December 20th, only gave Zahran one day's notice in violation of the rules. He further explained that his wife had to attend a Christmas party for her students; that he had four daughters in college and hadn't seen them since the previous summer; and that he and his family spent most of their time visiting relatives in Wisconsin. (Zahran did not mention, however, that during this same time he was filing other briefs in this case and also was responding to a document request in a separate case he is prosecuting in the Circuit Court of Cook County. *See* Docket # 137.) Zahran asked for 21 days to file his response brief. In an effort to move this case along, this Court granted the motion and even gave Zahran an extra week beyond what he asked for, setting the new date for filing his response as February 2nd.

On February 1st, the day before the brief was due, Zahran filed an emergency motion asking for ten more days from February 1, 2007. His explanation this time was that he and his wife work full-time and that he was running a company in Georgia that requires heavy travel on his part. (Mot. at ¶ 2.) He also added that he and his wife were proceeding *pro se* and had other interferences that included Zahran's need to prepare tax forms such as W2's for Zahran's clients; the need to spend time with their daughters; a family reunion he had to attend in Wisconsin; and the fact that Zahran "also experienced medical difficulty with gout and could not be on his feet for a few days." (*Id.* at ¶¶ 3-7.) Zahran again did not include in these explanations that he had spent some portion of this time filing other briefs in this case. *See* Docket # 144. This time, we gave him 14 more days, ordering that his response be filed by February 16th.

*11 Zahran also missed this deadline. Five days later, he filed a motion for leave to file his brief instanter because, he explained, he had been stuck in a snowstorm the "prior week." Although this excuse was questionable, we allowed him to file his response brief in part due to the significance of the motion filed against him. As this summary shows, Zahran has missed several deadlines and offered questionable excuses at the last-minute even when, for many of these excuses, he

would have known ahead of time about the problem such as his need to prepare regularly-scheduled tax filings. As noted above, the Wisconsin appellate court did not allow Zahran to file his appellate brief because it came to a similar conclusion, questioning Zahran's excuse that his photocopier machine broke down. We emphasize that this is not a one-time occurrence due to an unforeseen problem. It is a *modus operandi*.

For all the above reasons, we find that the plaintiffs' conduct in this litigation has been serious, repeated, willful, costly, and unjustified. Serious sanctions are warranted. Opposing counsel, Judge Mason, and this Court have spent unnecessary time sifting through Zahran's confusing, misleading, false, repetitive, and incomplete statements throughout the course of this litigation. Weik in particular has had to constantly badger Zahran, calling him, emailing him, getting vague answers, waiting for further responses that were late and still incomplete, then receiving new and different responses, and finally going to court and having to respond to misleading descriptions of what happened. Contrary to Zahran's assertions, this is not a case where both sides have engaged in the same unprofessional behavior. It is a one-sided affair. This point is demonstrated by, among other things, the Rule 37 conference where Weik showed commendable restraint in the face of distracting and unprofessional comments by Zahran.

Having found that plaintiffs' conduct justifies the imposition of sanctions, the only remaining question is what sanctions are appropriate. Defendants ask for what is usually considered the most severe sanction of dismissal of all of plaintiffs' claims. Defendants alternatively suggest that we limit damages on certain claims to the statutory amount of $1,000 or that we impose monetary sanctions or even some combination of the above.

Although a monetary sanction is usually considered a lesser sanction and one that is often imposed first, we find that it would be inadequate here for several reasons. One is that there is doubt as to whether such a sanction would work. As noted above, plaintiffs have been ordered to pay monetary sanctions before and have not paid them. Another problem is that this Court has serious doubts that plaintiffs would ever be able to effectively bring their case to trial or that they will be able to provide adequate discovery responses to allow defendants to have a fair trial. We also believe that continued efforts to move forward will only lead to the expenditure of more unnecessary fees. And perhaps most significant of all, as noted above, we can no longer trust plaintiffs' word. *See, e.g., Ridge Chrysler Jeep, LLC v. Daimler Chrysler Services North Am., LLC,* 2006 WL 2808158, *8 (N.D.Ill. Sept.6, 2006) (dismissing case as a sanction: "When discovery non-compliance [ ] is coupled with lies to both an adversary and the Court in order to. gain an advantage in the litigation, the Court must step in and impose the ultimate sanction in order to preserve the integrity of the federal judicial system."). We thus find that dismissal with prejudice is an appropriate and justified sanction.

## CONCLUSION

*12 For the reasons set forth above, defendants' motion for sanctions is granted and plaintiffs' remaining claims are dismissed with prejudice. The parties are directed to appear at a status hearing on November 14, 2007 to discuss how to proceed on defendants' remaining counterclaims.

Footnotes

1     This transcript is plaintiffs' Ex. 13a and 13b and will be referred to as "Tr. at _____."

2     To be more precise, we ruffled through the large stack of un-tabbed exhibits until we eventually found them at the bottom in exhibits 34 and 36. Zahran did not tell us the numbers of these exhibits in his response brief.

3     We note for the record that Mrs. Zahran did not make such comments during the conference and, insofar as we can tell, generally acted in a cordial and professional manner in this litigation. At the same time, she agreed to allow her husband to make these various representations on her behalf and is therefore equally bound by this ruling.

# APPENDIX

When this Court adverted orally to Judge Nordberg's opinion in Zahrans' earlier litigation after learning of it through PNC's attachment of that opinion as an exhibit to its renewed motion to dismiss the FAC (this Court had no prior knowledge of that earlier action or of Judge Nordberg's opinion), Zahran objected that the opinion had been withdrawn and should therefore not be considered. This Court has no reason not to credit Zahran's statement, and it certainly has no desire to expand the current imbroglio further by looking into that subject. Moreover, Judge Nordberg has just announced his retirement from this District Court on the 32d anniversary of President Reagan's signing of his judicial commission, so that the exception to ex parte communications that permits judge-to-judge communications would no longer apply to permit an inquiry of now former Judge Nordberg if this Court were inclined to explore the matter further (as it is not).

That said, however, this Court is of course well aware of the near-universal practice of members of the judiciary (including this Court) to respond, upon receiving one of the infrequent requests by litigants to withdraw already-issued formal written opinions, with the answer suggested by Stanza 71 of <u>The Rubaiyat of Omar Khayyan</u>:

> The Moving Finger writes; and, having writ,
> Moves on: nor all your Piety nor Wit
> Shall lure it back to cancel half a Line,
> Nor all your Tears wash out a Word of it.

That principle does not of course apply where a judge has determined that an opinion was issued in error and should therefore be withdrawn, but nothing of that sort was suggested by Zahran here as to Judge Nordberg's opinion. Instead the more common occasion for withdrawal of an issued opinion stems from litigants' resolution of a dispute between them, with one party agreeing to such resolution on condition that the unfavorable opinion should not be left in place,

and the Court accommodates that party's request in the interest of assisting the litigants in implementing their agreed-upon resolution.

In this instance this Court had already expressed itself in the terms outlined in this opinion of its own before it ever knew about Judge Nordberg's earlier opinion and decision. It is thus quite irrelevant to the present case whether or not that Judge Nordberg opinion was withdrawn or, if it was, what occasioned the withdrawal.

It should again be emphasized that the views and the rulings expressed in <u>this</u> Court's opinion were formulated from its extended and repeated exchanges with Zahran well before this Court had even heard of the earlier Judge Nordberg opinion and ruling. It is however noteworthy that Zahran's characteristics referred to by Judge Nordberg -- his pejorative characterizations of his adversaries and the mindset that he manifested more than a half-dozen years ago -- are almost eerily mirrored in his performance before this Court, further negating any possibility that this Court's discussion of the merits and the conclusions it has announced reflect solely subjective views.[1]

---

[1] To label Zahran as a serial litigator would be a major understatement. PNC's renewed motion to dismiss -- its March 22, 2014 filing targeting the FAC -- not only identified Judge Nordberg's opinion (which had itself referred to 75 earlier lawsuits to which Zahran or Zahran and his wife had been parties (30 federal cases, 20 cases in the Circuit Court of Cook County and 25 cases in the Circuit Court of DuPage County) but also listed at least 10 lawsuits in Cook County and several in this District Court filed since the issuance of Judge Nordberg's opinion. And as the Judge Nordberg opinion also noted, several other courts have not only warned Zahran about his litigation conduct but have sanctioned him on a number of occasions.